# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>*Digital devices seized on July 8, 2020 and presently in the custody of the Federal Bureau of Investigation in Washington, D.C., and Riverside and Ontario, California* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 8:20-MJ-00488 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(i) and 26 U.S.C. §§ 5861(c), (d), (f) | See Attachment B |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dewey Stover, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>

Hon. Douglas F. McCormick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Dennise Willett, x3540

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on July 8, 2020 and presently in the custody of the Federal Bureau of Investigation in Washington, D.C., and Riverside and Ontario, California:

a.    A Black "Apeman" dash camera with charger, containing SanDisk Ultra Plus 256 GB, S/N 9513YVAF3112, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

b.    White iPhone 8 plus with case with "Black Lives Matter" and "Stussy" stickers IMEI 3586330920404615, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California;

c.    Black MacBook Air S/N: C1MS32GAH3QF with charger, currently maintained in the custody of the Federal Bureau of Investigation in Washington D.C.;

d.    Silver 32GB iPod S/N: CCQGCLQ7DCP9, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

e.    White iPod with pink back S/N: DJ6PM094DJFD, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

f.    Western Digital Passport for Mac with USB cord S/N: WXF1A88LZVK2, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California; and

g.    Black HP laptop with charger S/N: 5CD30879RL,

currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 844(i) (Arson Affecting Interstate or Foreign Commerce) and 26 U.S.C. §§ 5861(c), (d), (f) (Unlawful Receipt, Possession, or Making, of a Destructive Device) (collectively, the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations and motive to commit said violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Instagram Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital

iii

device and which relate to the above-named violations and motive to commit said violations;

      d.  Records, documents, programs, applications, materials, or conversations related to the use of fire-starting devices and explosive devices;

      e.  Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of fire-starting devices and explosive devices;

      f.  Contents of any calendar or date book;

      g.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      i.  With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Dewey Stover, being duly sworn, declare and state as follows:

### I.  <u>INTRODUCTION</u>

1.  I have been a Special Agent ("SA") with the FBI since May 2016.  I am currently assigned to the Los Angeles Field Office, Riverside Resident Agency, Domestic Terrorism Squad, as part of the Inland Empire Joint Terrorism Task Force.  In this capacity, I investigate criminal violations relating to acts of domestic terrorism and other violations in the Titles 18, 21, and 26 United States Code, among other things.  I have received specialized training in conducting criminal, weapons of mass destruction, and counterterrorism investigations.  In addition to FBI SA training at Quantico, Virginia, I have completed the International Firearm Specialist Academy's Firearm Specialist certification course, where I learned how to determine if an item is a firearm or destructive device, its official classification, and whether its possession, manufacture, or sale violates federal law.  I have also completed the FBI Basic Post Investigator certification course, which is a comprehensive and field exercise training to identify, safely handle, reconstruct and analyze blast crime scenes and destructive devices, to include evidence.  In regard to digital devices, I have completed numerous social media and open source training courses.  I have also completed the Cellular Analysis and Survey Team Basic cellular analysis course.  Prior to working for the FBI, I was a Border Patrol Agent from April 2007 to April 2016.

2.     This affidavit is made in support of an application for a warrant to search the following seven digital devices (collectively, the "SUBJECT DEVICES"), seized on July 8, 2020 from 42120 Golden Eagle Lane, Palm Desert, California, pursuant to a state search warrant, and currently in the custody of the Federal Bureau of Investigation ("FBI"), in Washington, D.C., and Riverside and Ontario, California:[1]

a.     A Black "Apeman" dash camera with charger, containing SanDisk Ultra Plus 256 GB, S/N 9513YVAF3112, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

b.     White iPhone 8 plus with case with "Black Lives Matter" and "Stussy" stickers IMEI 3586330920404615, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California;

c.     Black MacBook Air S/N: C1MS32GAH3QF with charger, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California;

d.     Silver 32GB iPod S/N: CCQGCLQ7DCP9, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

e.     White iPod with pink back S/N: DJ6PM094DJFD, currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California;

---

[1] The SUBJECT DEVICES are identified in Attachment A and the list of items to be seized is set for in Attachment B of the search warrant application.  Attachments A and B are incorporated herein by reference.

   f. Western Digital Passport for Mac with USB cord S/N: WXF1A88LZVK2, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California; and

   g. Black HP laptop with charger S/N: 5CD30879RL, currently maintained in the custody of the Federal Bureau of Investigation in Ontario, California.

  3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 844(i) (Arson Affecting Interstate or Foreign Commerce) and 26 U.S.C. §§ 5861(c), (d), (f) (Unlawful Receipt, Possession, or Making of a Destructive Device) (collectively, the "Subject Offenses").

  4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. SUMMARY OF PROBABLE CAUSE

  5. The FBI is investigating the May 31, 2020 arson at the East Valley Republican Women Federated ("EVRWF") headquarters located in La Quinta, California.  As detailed below, the FBI identified CARLOS ESPRIU ("ESPRIU"), a 23 year-old resident of Palm Desert, CA, as the suspected perpetrator of the arson.

Video recordings of the incident show a man that matches
ESPRIU's person breaking windows of the EVRWF and then throwing
Molotov cocktails into the building.

6.     On July 8, 2020, Riverside County Sheriff's Department
("RCSD") and California Department of Forestry & Fire Protection
("CAFFP"), executed state search warrants at ESPRIU's residence,
and car, and on his person for samples of ESPRIU's DNA.  The FBI
assisted the state authorities in the execution of the search
warrants.  During the search, the RCSD recovered the SUBJECT
DEVICES identified above, among others.  The RCSD and CAFFP
asked the FBI to conduct forensic examination of the digital
devices and the DNA samples.  The FBI took custody of the
devices and samples for examination.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

7.     Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.     May 31, 2020 Arson at EVRWF**

8.     On May 31, 2020, at approximately 1:15 a.m., Closed
Circuit Television ("CCTV") and surveillance footage depicted a
man wearing black pants, a black sweatshirt, and a black hood
breaking windows of the EVRWF and using a green lighter to set
fire to orange rags partially stuffed inside of a taped
triangular set of 3 bottles, and threw the lit bottles into the
EVRWF headquarters.

9.     Based on my training and experience, as well as from
my knowledge of this case, I believe that the explosive device

used was, or was similar to, what is commonly known as a Molotov cocktail.  At the request of state law enforcement, the remnants of the Molotov cocktail were sent to the FBI Laboratory, Explosives and Hazardous Device Unit.  According to Dr. Jason A. Barrow's forensic examination of the device and videos of the incident, the Molotov cocktail, also known as a fire bomb, was used as a destructive device, as defined by Title 26 United States Code Section 5845(f)(1)(A) and (D).  Dr. Barrow found that the device was an improvised incendiary device ("IID"), which is commonly constructed using a breakable container filled with an ignitable liquid and some type of wick.  To utilize, the wick is ignited and the IID is thrown which breaks the container.  As the liquid spreads from the broken container it is ignited by the burning wick.  Forensic analysis and videos depicting the suspect throwing the device into the EVRWF to start a fire established that the Molotov cocktail was a bomb and missile having an explosive or incendiary charge of more than one-quarter ounce, and therefore meets the federal definition for a destructive device.  Additionally, only individuals with destructive devices registered to them in the National Firearms Registration and Transfer Record ("NFRTR") are allowed to possess them.  According to a records check of NFRTR, ESPRIU does not have any destructive devices registered to him.

10.  I reviewed the video recordings of the incident provided by the EVRWF and a nearby restaurant.  In the recordings, a man wearing a backpack, dressed in black pants, a black hood, and a black sweatshirt with the word "STUSSY" on the

front, runs up to the EVRWF office with a bat.  Using the bat,
he breaks several of the office's windows.  He drops the bat,
and removes a set of 3 bottles taped together from his backpack.
He sticks an orange rag into one of the bottles, pulls a green
lighter from his pocket, and lights the rag on fire.  He then
throws the lit device into the office through one of the broken
windows.  He grabs the backpack and bat, runs to his car and
drives away from the scene.  On this first effort, the device
failed to catch fire.  Approximately seven minutes later, the
man returns to the EVRWF office, retrieves the device, and
returns to his car.  Videos then show the man returning one more
time from his car, with the device in hand, reignited, and
throwing the device through the broken windows, back inside the
EVRWF.  Video footage captured images of the suspect who
appeared to be a thin male, white or Hispanic, in his 20's
dressed in the clothing as described above.  The video footage
also showed that the suspect was driving a silver-colored
subcompact car, likely a Honda Fit or Toyota Scion, without a
front license plate.  The side view mirror covers on the car
were different colors; one silver and one black.

     11.  After the fire, EVRWF circulated a reward flier that
included still photographs captured from the security camera
footage.  I have reviewed the flier, which depicts the face,
body, and distinctive clothing of the person who set the fire.
The reward flier asked the community to contact law enforcement
with any information about who set the fire.  Several people
responded to the flier and an FBI Task Force Officer ("TFO"),

spoke to two individuals over the phone.  Both callers said that they believed the person depicted in the still photographs was the user of a specific Instagram handle, @barlosxantanx.  One caller identified ESPRIU by his full name and stated that ESPRIU previously worked at a McDonald's Restaurant that shared the parking lot with EVRWF headquarters.[2]

12.  According to information provided by Instagram, the Instagram account @barlosxantanx is registered to ESPRIU and the phone number AT&T subscriber records attributed to him.  I also examined photographs on ESPRIU's publically available @barlosxantanx Instagram page and confirmed that they match the individual I know to be ESPRIU from his California Driver's License ("CDL") photograph.  Additionally, the person depicted in the @barlosxantanx Instagram account and ESPRIU's CDL photograph resembles the person in the EVRWF video footage.

13.  I also reviewed a screenshot of a tweet from a Twitter account for barlosxantanx, the same handle as that of the Instagram account registered to ESPRIU.  A tweet posted on May 28, 2020, three days before the fire at EVRWF's office, stated: "I wanna go burn shit n get hit with tear gas."

14.  Following the circulation of the EVRWF flier, ESPRIU's Instagram and Twitter accounts were no longer publically accessible.  An FBI TFO was unable to access ESPRIU's account when searching the barlosxantanx handle, and contacted one of

---

[2] The other caller believed his first name was "Carlos," but that his last name was "Gonzalez."  Subsequent investigation showed that the surname "Gonzalez" was incorrect.  However, both tipsters identified the same Instagram handle belonging to ESPRIU.

the tipsters.  The tipster also could not access the account,
likely because ESPRIU either deactivated the account or made the
account "private," meaning that they would not be viewable by
the general public.

15.  ESPRIU restored his Instagram account a few days
later, which was then publically available.  I reviewed one
video ESPRIU posted on his Instagram account.  In the video,
ESPRIU states "Fuck Donald Trump," and then ESPRIU and another
individual start to chant "Fuck Donald Trump" along with a crowd
of other individuals.  The chant continues for approximately 30
seconds.

16.  In my review of the EVRWF videos and interviews of
EVRWF members, I learned that prior to the fire, the EVRWF
storefront displayed numerous banners, posters, and merchandise
with the name "TRUMP", some of which were destroyed.
Additionally, merchandise for sale containing the name "TRUMP"
was prominently displayed throughout the EVRWF office.

17.  Surveillance teams at ESPRIU's residence provided
images of ESPRIU.  I reviewed those images and ESPRIU's
appearance in surveillance photos is consistent with the
appearance of the person captured in the security camera footage
during the EVRWF fire, except that ESPRIU appeared to have
shaved his facial hair.  Surveillance agents also provided
images of ESPRIU driving a 2007 silver Honda Fit, registered to
ESPRIU, without a front license plate and with one silver side
view mirror cover and one black side view mirror cover.
ESPRIU's car matches the make, model, color, and distinctive

features of the car captured in videos driven by the person who set fire to the EVRWF headquarters.

18.  I spoke with Joy Miedecke, the President of EVRWF, who told me that the organization's primary goal at this time is to raise funds for the national 2020 re-election campaign of President Donald J. Trump.  In addition, Ms. Miedecke provided me with receipts showing that merchandise sold within the EVRWF office was purchased from a company located in Kansas and shipped in interstate commerce to the EVRWF office in La Quinta, California.

**B.    Execution of State Search Warrants**

19.  On July 6, 2020, the Honorable Mark R. Fisher, Superior Court Judge of the State of California, Riverside County, signed state search warrants for evidence related to the EVRWF arson, authorizing the RCSD and CAFFP to search ESPRIU's residence, car, and person of CARLOS ESPRIU, to include the taking of DNA samples.  According to law enforcement reports of the search, and discussions with state officers, the following items were seized during the search:

a.    Orange rags, consistent in appearance with the rags used as wicks for the Molotov cocktails on May 31, 2020;

b.    In defendant's car, a green lighter that was consistent in appearance with the lighter used to light the Molotov cocktails on May 31, 2020;

c.    In defendant's residence, clothing and shoes that appeared consistent with the clothing worn by the person captured in the security camera footage on May 31, 2020;

      d.    Kingsford lighter fluid in defendant's car;

      e.    Black nitrile disposable gloves, consistent with those worn by the person captured in the security camera footage on May 31, 2020;

    20.  Additionally, I know from conversations with officers and my review of law enforcement reports that officers found and seized numerous digital devices, including the following SUBJECT DEVICES:

      a.    A Black "Apeman" dash camera with charger, containing SanDisk Ultra Plus 256 GB, S/N 9513YVAF3112, found in the Honda Fit driven by ESPRIU;

      b.    White iPhone 8 plus with case with "Black Lives Matter" and "Stussy" stickers IMEI 3586330920404615, found in ESPRIU's bedroom;

      c.    Black MacBook Air S/N: C1MS32GAH3QF with charger, found in ESPRIU's bedroom;

      d.    Silver 32GB iPod S/N: CCQGCLQ7DCP9, found in ESPRIU's bedroom;

      e.    White iPod with pink back S/N: DJ6PM094DJFD, found in ESPRIU's bedroom;

      f.    Western Digital Passport for Mac with USB cord S/N: WXF1A88LZVK2, found in ESPRIU's bedroom; and

      g.    Black HP laptop with charger S/N: 5CD30879RL, found in ESPRIU's bedroom.

    21.  While at the search warrant location, I spoke to ESPRIU's sister.  ESPRIU's sister told me that ESPRIU was the sole driver of the 2007 Honda Fit which contained the seized

dash camera.  ESPRIU's father stated that all digital devices in the room ESPRIU was found in were exclusively controlled by ESPRIU.

### C.   Status of the Digital Device Searches

22.  The SUBJECT DEVICES are currently in the custody of the FBI in Washington, D.C., and Riverside and Ontario, California.  Thus far, the searches pursuant to the state warrant have uncovered additional evidence to establish ESPRIU's identity as the arsonist.  On the Western Digital Passport (listed above at ¶2f and ¶20f), a photo taken on March 18, 2020, was found depicting a man resembling ESPRIU holding a chrome bat.  The bat appeared to be similar to the chrome bat used by the arsonist to break the EVRWF windows.  Additionally, a video with audio dated June 28, 2020, was found on the SD card contained in the dash camera (listed above at ¶2a and ¶20a.) I have reviewed the video and the driver of the car is ESPRIU. The video does not capture his image, but I recognize ESPRIU's voice on the video from ESPRIU's social media videos and my personal interaction with him on July 8, 2020.  On the dash camera video, ESPRIU picks up an unknown female in his car. ESPRIU asks her, "Wanna know why I had to shave my beard?"[3] ESPRIU also says, "I was on the news though", and explains there was a story on KESQ[4] about someone who "vandalized the Trump store in La Quinta" and "tried to burn it down".  When the

---

[3] In my review of the EVRWF video, the suspect resembles ESPRIU, but has a goatee.

[4] KESQ is a television station that broadcasts to cities in the Coachella Valley and Inland Empire.

female asks if he was the arsonist, he replies, "You didn't see the pictures?"  When the female asks ESPRIU why he did it, ESPRIU replies, "Cuz fuck that Motherfucker".  ESPRIU then tells the female that he went to a protest the day after the arson and yelled at police.  I reviewed ESPRIU's Instagram page and found a video titled, "Fuck Cops", which shows ESPRIU at a protest after the arson took place, cursing at police.

### D.   Probable Cause that Evidence of the Subject Offenses will be Found on the SUBJECT DEVICES

23.  ESPRIU's car matches the car captured in the videos driven by the suspect, so the dash camera from ESPRIU's car may have video of his travel in the area of the EVRWF to establish his familiarity with the EVRWF's location, or there may be additional videos capturing conversations with others about the arson.  ESPRIU has numerous social media accounts, specifically Instagram, Twitter, Facebook, and Snapchat.  In order to access those accounts, ESPRIU must use digital devices.  ESPRIU has posted numerous videos and images on social media showing his animus towards Donald Trump, likely using and stored on the SUBJECT DEVICES, which are evidence of motive for the Subject Offenses.  ESPRIU posted comments about his desire to burn things, which would likely be stored on the SUBJECT DEVICES.  It is also likely that ESPRIU did relevant internet searches on the SUBJECT DEVICES.  Based on my training and experience, amateur arsonists (ESPRIU has no record of prior arrests for arson) research methods of creating destructive devices online, and those searches will likely be captured on the SUBJECT DEVICES.

## IV. TRAINING AND EXPERIENCE ON FIRE AND EXPLOSIVES OFFENSES

24. Based on my training and experience and familiarity with investigations into arson and the use of explosive devices conducted by other law enforcement agents, I know the following:

a.   Arson and the use of explosive devices often involve numerous co-conspirators, from those who create the explosive devices and arson devices, to those who transport them, and those who use them.

b.   Arsonists and those who use explosive devices often use the Internet to learn how to (or to share information about how to) construct, use, store, find, sell, and trade explosive devices or fire-starting devices.  Oftentimes, these searches or instances of information-sharing take place on their cell phones and other Internet-connected digital devices.

c.   Communications between people engaging in or interested in engaging in arson and/or using explosive devices take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the explosive devices or fire-starting devices and discussion of plans to use the devices.  In addition, it is common for people engaged in using explosive devices or fire-starting devices to have photos and videos on their cell phones of such devices they or others working with them possess, as they frequently send these photos to each other and others to boast about fires they have started, explosive

13

devices they have used, or to facilitate further use of
explosive devices or fire-starting devices.

       d.   Arsonists and people who use explosive devices
often keep the names, addresses, and telephone numbers of other
arsonists and those who use explosive devices on their digital
devices.  Arsonists and those who use explosive devices often
keep records of meetings with associates, and suppliers on their
digital devices, including in the form of calendar entries and
location data.

       e.   Individuals engaged in arson and the use of
explosive devices often use multiple digital devices.

### V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

25.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

26.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

15

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**VI. <u>CONCLUSION</u>**

29.  For all of the reasons described above, there is probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

of the Subject Offenses will be found on the SUBJECT DEVICES, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of _____, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

17